UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NORTH SHORE BANK FSB,

          Plaintiff,

          v.                     Case No. 10-C-71

PROGRESSIVE CASUALTY INSURANCE COMPANY,

          Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. FACTS AND PROCEDURAL HISTORY

In October of 2006, a seemingly successful business owner from Illinois, Russell Ott ("Ott"), approached North Shore Bank ("the Bank") seeking a loan to purchase a motor home. (Docket No. 1 at ¶6.) Although such transactions may be common for banks, certain factors made this transaction somewhat unique. First, there was the size of the loan. Ott sought a loan of $404,881.00 to purchase a motor home with a retail price of $679,995.00. (Docket No. 1 at ¶6.) Second, there was the fact that Ott sought to purchase this vehicle from his own dealership, Pro Source Motorsports, located southwest of Chicago. (Docket No. 1 at ¶6.)

Because this transaction was somewhat unusual, the Bank sent a representative to Illinois to inspect the motor home Ott sought to purchase as well as Ott's dealership. (Docket No. 1 at ¶8.) The loan officer confirmed the vehicle identification number ("VIN") on the motor home against the VIN on the vehicle's Certificate of Origin and took several photos of motor home. (Docket No. 1 at

¶8; see also Docket No. 1 at 6.) Ott's dealership appeared busy and with a large inventory. (Docket No. 1 at ¶9.)

The Bank closed the loan and subsequently received a title for the motor home reflecting the Bank's security interest. (Docket No. 1 at ¶11.) For two years, Ott made all payments on the loan but on December 3, 2008, the loan became past due. (Docket No. 1 at ¶11.) The Bank began an investigation into the motor home and learned that the Certificate of Origin Ott provided was a fraud. As a result, the Bank did not have a valid security interest in the motor home. (Docket No. 1 at ¶12.) From its investigation the Bank believes that Ott created a fake Certificate of Origin and affixed a fake VIN plate to the motor home to match the VIN on the fake Certificate of Origin. (Docket No. 1 at ¶13.) The Bank further believes that the vehicle it inspected was actually a 2003 Beaver Marquis with a VIN of 1RFC65**61193**3020168 whereas the Certificate of Origin was for a 2007 Beaver Marquis with a VIN of 1RFC65**71373**020168. (Docket Nos. 1 at ¶13; 45 at ¶¶17, 25.) The manufacturer of the Beaver Marquis motor homes confirmed that it never issued a Certificate of Origin for a vehicle with the VIN that appeared on the Certificate of Origin that Ott presented to the Bank. (Docket No. 38.) Through its investigation, the Bank learned that federal investigators believe that Ott has defrauded financial institutions of a total of about $45,000,000.00. (Docket Nos. 35 at ¶13; 40 at ¶18; 43 at ¶18.)

Upon discovering this fraud, the Bank sought to recover $371,646.59 under the bond issued by Progressive Casualty Insurance Company ("Progressive") on the basis that the Bank relied upon a counterfeit Certificate of Origin in issuing the loan. (Docket No. 1 at ¶¶15-17.) Progressive denied coverage on the basis that the fraudulent Certificate of Origin was not "counterfeit" as that term is defined within the bond.

The bond provides, in part, as follows:

(E) Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

2

* * *

>> (3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (e) above which is a Counterfeit.
>
> Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.

(Docket No. 40 at ¶19; Docket No. 32-17 at 8.) A Certificate of Origin is included in the items listed in (a) through (h). (Docket No. 32-17 at 8.) The bond defines "counterfeit" as "a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original." (Docket No. 32-17 at 12.)

On January 27, 2010, the Bank filed suit in this court. (Docket No. 1.) This case was randomly assigned to this court and all parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 7, 15.) Following a period for discovery, both parties have moved for summary judgment. (Docket Nos. 30, 33.) Each party has responded, (Docket Nos. 42, 44), and replied, (Docket Nos. 48, 51). The pleadings on the parties' motions are closed and the matter is ready for resolution.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson, 477 U.S. at 248. A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**III. ANALYSIS**

Progressive contends that although fraudulent, the Certificate of Origin relied upon by the Bank is not "counterfeit" as a matter of law and thus the bond does not provide coverage for the Bank's claim. (Docket No. 31 at 9-16.) Not surprisingly, the Bank contends that the fraudulent Certificate of Origin was plainly "counterfeit" and thus the bond provides coverage for its loss. (Docket No. 34 at 8-12.) In response, in addition to reiterating its argument that the Certificate of Origin was not counterfeit, Progressive contends that the Bank failed to act in good faith, as the bond requires. Progressive also argues that, even if the bond provides coverage, the Bank's loss is a maximum of $315,000.00, which, because of the $100,000.00 deductible for the bond, leads to a maximum claim against Progressive in the amount of $215,000.00. (Docket No. 42.)

**A. Choice of Law**

This case comes before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, and thus this court is required to apply state substantive law. Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087 (7th Cir. 1999). Progressive contends in a footnote in its initial brief that Wisconsin law applies in this case. (Docket No. 31 at 9.) The plaintiff does not dispute Progressive's assertion or otherwise address the choice of law question. Thus, in the absence of any dispute, the law of this court's forum state, i.e. Wisconsin law, applies in the present case. Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, 136 F.3d 1116, 1120 (7th Cir. 1998) (quoting Wood v. Mid-Valley, Inc., 942 F.2d 425, 426-27 (7th Cir. 1991)) ("the operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. . . . Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."); see also Grundstad v. Ritt, 166 F.3d 867, 870 (7th Cir. 1999) (same).

Therefore, this court must attempt to predict how the Wisconsin Supreme Court would decide the issues presented here. Lexington Ins. Co., 165 F.3d at 1090 (citing Allen v. TransAmerica Ins. Co., 128 F.3d 462, 466 (7th Cir. 1997)). "Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Id. "In the absence of Wisconsin authority, [a federal court] may consider decisions from other jurisdictions." Id. (citing Valerio v. Home Ins. Co., 80 F.3d 226, 228 (7th Cir. 1996)).

**B. "Counterfeit"**

> Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties. Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co., 2000 WI 26, ¶23, 233 Wis. 2d 314, 607 N.W.2d 276. Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. Kremers-Urban Co. v. American Employers Ins. Co., 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). However, [a court does] not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a

5

premium. Wisconsin Label[v. Northbrook Prop. & Cas. Ins. Co.], 2000 WI 26, 233 Wis. 2d 314, P25, 607 N.W.2d 276.

Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65.

The present bond is a standard financial institution bond, varieties of which have existed since 1916. First Nat'l Bank v. Cincinnati Ins. Co., 485 F.3d 971, 977 (7th Cir. 2007). Over time, this standard form has undergone numerous revisions and therefore courts presented with a financial institution bond must determine which version of the bond is at issue. Id. "[C]ase law interpreting one revision may be unhelpful or even irrelevant to the task of interpreting another." Id. The present bond is "Standard Form No. 24, Revised to April 1, 2004." (Docket No. 32-17 at 4.)

In 1969, the Seventh Circuit Court of Appeals was tasked with applying Illinois law to determine the meaning of the term "counterfeited" as it was used in an earlier version of what was then called bankers blanket bond. Capitol Bank of Chicago v. Fidelity & Casualty Co., 414 F.2d 986, 988 (7th Cir. 1969). In Capitol Bank, a bank made a loan to a business and relied upon certain invoices as collateral. Id. at 987. When the business defaulted and the bank tried to collect its collateral, it learned that the invoices the business produced were fraudulent. Id. The bank's insurer refused to indemnify the bank for its losses in part upon the basis that fraudulent invoices referring to non-existent transactions are not "counterfeit."

The Seventh Circuit agreed with the insurer and stated that "the bank was defrauded because the underlying transaction did not take place rather than by the similarity of the invoices presented to authentic ones." Id. at 989 (citing First National Bank and Trust Co. v. United States Fidelity and Guaranty Co., 347 F.2d 945 (10th Cir.1965); Exchange National Bank of Olean v. Insurance Company of North America, 341 F.2d 673 (2d Cir.1965)). It noted that unlike objects like counterfeit stock certificates, which it regarded as being clearly within the purview of the bond, it would have been relatively easy for the bank to confirm the veracity of the invoices by, for

6

example, contacting the loan applicant's purported customer. Id. (quoting Exchange National Bank of Olean v. Insurance Company of North America, 341 F.2d 673, 676 (2d Cir. 1965)).

But Capitol Bank and the cases relied upon by the Seventh Circuit in that decision are distinguishable and of minimal assistance to this court because the standard bond was subsequently revised to contain a definition of "counterfeit" within the bond. National City Bank v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 178 (Minn. 1989).

Initially, "counterfeit" or "counterfeited" was defined in the standard financial institution bond as "an imitation which is intended to deceive and to be taken as an original." Applying this or an essentially identical definition, courts across the country held that simply because a document is fraudulent does not mean that it is "counterfeit." See, e.g., Dakota W. Credit Union v. Cumis Ins. Soc'y, 532 F. Supp. 2d 1110 (D.N.D. 2008) (holding that faxed and unsigned "Buyer's Bill" was not counterfeit, in part, because it was not an imitation or alteration of a preexisting genuine "Buyer's Bill"); French American Banking Corp. v. Flota Mercante Grancolombiana, S.A., 752 F. Supp. 83, 91 (S.D.N.Y. 1990) (holding that fraudulent bills of lading were not counterfeit because "there were never two identical sets of bills of lading, one genuine and one counterfeit"); National City Bank v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171 (Minn. 1989) (holding that fraudulently created stock certificates were not counterfeit because they were not imitations of genuine stock certificates); Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank, 685 F. Supp. 148 (N.D. Tex. 1988) (holding that fraudulently created stock certificates were not counterfeit because there never existed any real stock certificate bearing loan applicant's name); Gateway State Bank v. North River Ins. Co., 387 N.W.2d 344, 348 (Iowa 1986) (holding that promissory notes that contained false information but were, in fact, original notes were not counterfeit); Liberty Nat'l Bank v. Aetna Life & Casualty Co., 568 F. Supp. 860 (D.N.J. 1983) (holding that certificates of deposit that falsely represented the existence of certain assets were not counterfeit); Richardson

Nat'l Bank v. Reliance Ins. Co., 491 F. Supp. 121 (N.D. Tex. 1977), aff'd, 619 F2d 557 (5th Cir. 1980) (holding that fraudulently created vehicle documents were not counterfeit because there never existed any original documents for the fraudulent documents to imitate); Bank of Southwest v. National Surety Co., 477 F.2d 73, 76 (5th Cir. 1973) (holding that fraudulently created vehicle "white slip" was not counterfeit because it did not seek to imitate an existing document and fraudulently obtained duplicate title was not "counterfeited" because it was an authentic document).

The court has not found any Wisconsin case, or any case applying Wisconsin law, to the issue of an institution bond's coverage for counterfeit documents. Although the Seventh Circuit in First Nat'l Bank v. Cincinnati Ins. Co., 485 F.3d 971 (7th Cir. 2007), applied Wisconsin law to determine whether a bond provided coverage for losses a bank incurred as a result of relying upon fraudulent documents, the claim in that case came under the bond's coverage for forgeries, a provision not at issue here. The court in that case did not discuss the scope of the bond's coverage for counterfeit documents.

However, in State Bank of the Lakes v. Kansas Bankers Sur. Co., 328 F.3d 906 (7th Cir. 2003), a case applying Illinois law, the Seventh Circuit did address the question of whether a similar financial institution bond covered losses resulting from counterfeit documents. In that case, the bank advanced money to a marina owner to purchase boats and in exchange the bank retained the Manufacturer's Statement of Origin ("MSO") for each boat the bank financed. Id. at 907. Because the MSO was required for the marina to sell a boat, when the marina owner sold a boat, he went to the bank, paid back the money owed, and then retrieved the MSO to sell the boat to a customer. Id. This arrangement worked well for years until the marina eventually failed and it was revealed that the marina owner had created duplicate or fake MSOs for certain boats and used the fakes to obtain multiple loans on the same boat. Id.

The bank sought to recover under its bond for its losses and the insurer paid certain of his claims. The insurer distinguished among MSOs that were signed, which the insurer determined were counterfeit under the bond, and unsigned MSOs, which it determined did not fit the bond's definition of counterfeit. Id. at 908. Following a bench trial, the district court found that the unsigned MSOs were counterfeit under the bond. Id. at 908. On appeal the Seventh Circuit affirmed. It noted that nothing in the bond's definition of "counterfeit" —"an imitation which is intended to deceive and to be taken as an original"—requires that a document be signed. Id. at 908. Rather, the court noted an absence of evidence in the record as to whether all MSOs are signed and speculated that perhaps the marina owner was leaving some unsigned to avoid arising suspicion by presenting the bank with MSOs that were "too perfect." Id.

Both parties cite the case in support of their respective, but contrary, positions. Both overstate the applicability of the case to the bond at issue in this case. Contrary to Progressive's assertion, (see Docket No. 42 at 4), at no point did the court in State Bank of the Lakes ever address the question of whether the bond required each fraudulent document to be a verbatim copy of a real and authentic original MSO. Rather, the only thing that the Seventh Circuit explicitly stated must be real was the referenced collateral. State Bank of the Lakes, 328 F.3d at 909 (citing cases). Because the boats to which the fraudulent MSOs referred were real, the court concluded that the absence of a signature did not bar a finding that the MSOs were counterfeit under the bond. Id.

But the Bank also overstates the significance of State Bank of the Lakes. The Bank contends that all that is necessary for a document to be counterfeit is that the object be "intended to deceive." (Docket No. 34 at 10.) The "intended to deceive" language is taken directly from the bond at issue in State Bank of the Lakes which defined "counterfeit" as "an imitation which is intended to deceive and to be taken as an original." State Bank of the Lakes, 328 F.3d at 907. Although the present bond also uses the phrase "intended to deceive" in defining "counterfeit," the present bond's

9

definition includes substantially more than the bond at issue in State Bank of the Lakes. (See Docket No. 32-17 at 12.)

In the court's view, Bank of the Lakes is of little assistance in resolving the present dispute, because the bond contained a markedly different definition of "counterfeit." Consequently, the central question at issue here was not addressed by the court in Bank of the Lakes. Therefore, the court turns to what is most crucial in any question about the meaning of a contract—the words of the contract itself. The bond defines counterfeit as "a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original." (Docket No. 32-17 at 12.) It is helpful to also note the contract's definition of "original" which is "the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed." (Docket No. 32-17 at 13.)

The definition contained in present bond is notably different from the bonds at issue in the cases cited above. In State Bank of the Lakes, as well as other case cited above, "counterfeit" or "counterfeited" was defined as "an imitation which is intended to deceive and to be taken as an original." See Dakota W. Credit Union, 532 F. Supp. 2d 1110; French American Banking Corp., S.A., 752 F. Supp. 83; National City Bank, 447 N.W.2d 171; Reliance Ins. Co., 685 F. Supp. 148; Gateway State Bank, 387 N.W.2d 344; Liberty Nat'l Bank, 568 F. Supp. 860; Richardson Nat'l Bank, 491 F. Supp. 121; Bank of Southwest, 477 F.2d 73.

The court here emphasizes how the definition differs from the language at issue in those other cases by underlining additions and striking through deletions: "a~~n~~ Written imitation <u>of an actual, valid Original</u> which is intended to deceive and to be taken as ~~an~~ <u>the</u> Original." (Docket No. 32-17 at 12) (With respect to the word "written," this word was included in the definitions of counterfeit at issue in three cases cited by the court, see National City Bank, 447 N.W.2d 171; Liberty Nat'l Bank, 568 F. Supp. 860; 491 F. Supp. 121; Bank of Southwest, 477 F.2d 73).

10

Nevertheless, the court had not identified any court in the country that has applied the precise definition of counterfeit at issue here.

It is strongly suggested in the foregoing cases which discuss a similar definition of counterfeit that an object is counterfeit within the meaning of the bond only if there is "an actual existing (or previously existing) original genuine document." National City Bank, 447 N.W.2d at 179 (quoting Reliance Ins. Co., 685 F. Supp. at 150).

> The basic rationale behind the definition of "counterfeit" is to require that an insurance company cover only non-business losses or insured risks, with a bank responsible for ordinary business losses. An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control. The Bond is not intended to cover this type of forgery loss. If a bank, such as respondent, chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess securities before remitting loan proceeds, it cannot successfully claim this is an insured risk and not an ordinary business loss.

Id. (internal citation omitted).

Should any question remain as to the correctness of the overwhelming view that a document is counterfeit only if it imitates an actual original, the definition contained in the present bond seems to have been amended specifically to remove any doubt. Seemingly mirroring the holdings of the cases cited above, the present definition requires that there be an "actual, valid Original." Moreover, by referring to "*the* Original" rather than merely "*an* Original," strongly suggests that it is not enough that a document generally appear to be "*an* Original" but rather by referring to "*the* Original" the bond requires the fraudulent document imitate a specific, actual, and valid original Certificate of Origin.

There is no doubt that the fake Certificate of Origin was meant to generally imitate a Certificate of Origin and was intended to deceive the Bank. However, it is similarly undisputed that there was never any "actual, valid Original" Certificate of Origin for a vehicle with the VIN

11

reflected on the fraudulent Certificate of Origin. (See, e.g., Docket No. 40 at ¶¶18, 27.) Although the VIN differs by only three digits from the VIN of the vehicle the Bank believes it inspected and believed was collateral for its loan, these three digits cannot be simply ignored. Discrepancies between a fraudulent copy and original in paper quality, font, or other insignificant details might reasonably be overlooked, see State Bank of the Lakes, 328 F.3d at 908, but a fake VIN or a vehicle title or certificate of origin is, in many ways, the coup de grâce. VINs on such documents are not in the vein of horseshoes and hand grenades; close is not good enough. Thus, because the fraudulent Certificate of Origin did not imitate an "actual, valid Original" Certificate of Origin, this court must conclude that the bond excludes coverage for the Bank's loss.

Although the Bank did seemingly make reasonable efforts try to determine that the Certificate of Origin related to an actual vehicle, it was ultimately a result of the Bank's incomplete investigation that Ott's fraud was not uncovered. Thus, denying coverage for this sort of loss is entirely consistent with the underlying purpose of this provision of the bond. See National City Bank, 447 N.W.2d at 179. The Bank did not take steps to determine whether the vehicle it inspected was, in fact, a 2007 Beaver Marquis motor home and not, as it later appeared to be, a 2003 model. (See Docket No. 45 at ¶16.) The person who inspected the motor home for the bank was unfamiliar with Monaco motor homes and had never before seen a 2007 Beaver Marquis. (Docket No. 45 at 14.) The Bank inspected only the VIN plate inside the motor home rather than double-checking the VIN on the Certificate of Origin against any of the other multiple spots a VIN appears on any motor vehicle. (Docket No. 45 at ¶18.) The Bank made no effort to determine whether a vehicle bearing the VIN on the Certificate of Origin had actually been produced, by, for example, contacting the manufacturer. Although these additional steps might seem like overkill for a routine transaction, this was not a routine matter. As noted above, this was a particularly large personal loan and there was

the additional factor that the debtor was making a purchase from his own dealership. Under such circumstances, a comprehensive investigation would not have been extraordinary.

**IV. CONCLUSION**

For the reasons set forth above, it is the conclusion of the court that the Certificate of Origin relied upon by the Bank was not "counterfeit" within the meaning of the bond because no "actual, valid Original" existed for the fraudulent document to imitate. Having concluded that the Certificate of Origin was not "counterfeit" it is unnecessary for the court to consider whether the Bank acted in good faith and whether there is a dispute of material fact as to the amount of the Bank's claim. Accordingly, the court shall grant Progressive's motion for summary judgment, (Docket No. 30), and deny the Bank's motion for summary judgment, (Docket No. 33).

**IT IS THEREFORE ORDERED** that Progressive's motion for summary judgment, (Docket No. 30), is **granted**.

**IT IS FURTHER ORDERED** that North Shore Bank's motion for summary judgment, (Docket No. 33), is **denied**.

The Clerk shall enter judgment accordingly dismissing Plaintiff's complaint and this action.

Dated at Milwaukee, Wisconsin this 15th day of April, 2011.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge
